[Cite as *State v. Dickson*, 2013-Ohio-3511.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO/CITY OF AKRON | C.A. No. 26609 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GILBERT DICKSON | AKRON MUNICIPAL COURT COUNTY OF SUMMIT, OHIO |
| Appellant | CASE Nos. 12-CRB-2526 12-CRB-4525 |

DECISION AND JOURNAL ENTRY

Dated: August 14, 2013

WHITMORE, Judge.

{¶1} Defendant-Appellant, Gilbert Dickson, appeals from the judgment of the Akron Municipal Court. This Court affirms.

I

{¶2} In early March 2012, Donald and Shannon Alexander noticed their dog, Papa Bear, was missing from their back yard. After several days of searching the neighborhood, they decided to make up flyers in hopes of finding the family pet. The flyer offered a reward, but did not specify how much. Shannon posted a flyer at a local convenient store on her way to work. Shortly thereafter she received a call from Pierre Cabell. Shannon asked Cabell to call Donald because she was on her way to work.

{¶3} Donald received a call from Cabell, and, according to Donald, offered him $100 for the return of Papa Bear. According to Cabell, Donald offered $500 for the dog. The two agreed to meet at the corner of Archwood and Grant to make the exchange. However, Cabell did

not bring Papa Bear, and Donald did not have the money. Cabell showed Donald pictures of the dog on his cell phone, and Donald identified him as Papa Bear. Donald testified that he told Cabell that Shannon had the $100 reward and that he would get it to him as soon as she finished work later that night. Cabell then told Donald he needed to call his uncle. Cabell called Gilbert Dickson, known as Uncle Dave, and handed the phone to Donald. According to Donald, Dickson demanded $500 for the return of the dog. Donald hung up and returned home, ultimately calling the police.

{¶4} Officers Michael Stanar and David Rouse responded to the Alexanders' home to take the report of a stolen dog. Donald relayed to the officers his conversations with Cabell and Dickson and the attempted exchange. Officers Stanar and Rouse both called Cabell's cell phone in an attempt to negotiate the return of the Papa Bear.

{¶5} Sometime thereafter, Cabell called Shannon again and said he only wanted to deal with her. Shannon testified that Dickson demanded $500 or he would shoot Papa Bear. Ultimately, another meet was setup and the police became involved again. The police, using an unmarked minivan, had a female officer pose as Shannon. Additional officers hid in the back of the minivan and waited for Cabell to arrive. Cabell arrived, but again did not have Papa Bear with him. When Cabell approached the minivan and asked for the money, the officers arrested him.

{¶6} Cabell told the officers that Papa Bear was at a house up the street and led the officers to Dickson's house. Officer Rouse arrived first, knocked on the back door, and asked for "Uncle Dave." Dickson came to the door and became very upset, demanding money for the dog. Ultimately, the officers were unable to calm Dickson and arrested him.

{¶7} Dickson was charged with (1) obstructing official business, in violation of Akron City Code ("A.C.C.") 136.11(A), a misdemeanor of the second degree; (2) disorderly conduct, in violation of A.C.C. 132.01(A)/(E), a misdemeanor of the fourth degree; (3) coercion, in violation of A.C.C. 135.08, a misdemeanor of the second degree; and (4) receiving stolen property, in violation of A.C.C. 131.17, a misdemeanor of the first degree. A jury found Dickson not guilty of receiving stolen property, but convicted him of the remaining charges. The court sentenced Dickson to (1) ninety days incarceration for obstruction, suspended on the condition of completing one year of probation, (2) thirty days incarceration for disorderly conduct, suspended on the condition he obey all laws for one year, and (3) one year of probation for coercion.

{¶8} Dickson now appeals and raises three assignments of error for our review.

II

Assignment of Error Number One

MR. DICKSON WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶9} In his first assignment of error, Dickson argues that his trial counsel was ineffective for "fail[ing] to move to dismiss both the obstructing official business and disorderly conduct charges." We disagree.

{¶10} To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. This Court need not address both *Strickland* prongs if the defendant has failed to prove either one. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-

Ohio-4941, ¶ 10. In a direct appeal, we review a claim of ineffective assistance of counsel de novo. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 53

{¶11} While Dickson has captioned his argument as a motion to dismiss, he does not challenge the validity of the indictment. Instead, the substance of his argument is that the police violated his constitutional right against an unreasonable search and seizure. *See* U.S. Constitution, Fourth and Fourteenth Amendments. Ohio Constitution, Article I, Section 14. The proper motion would be a motion to suppress based on the constitutional violation.

> A "motion to suppress" is defined as a "[d]evice used to eliminate from the trial of a criminal case evidence which has been secured illegally, generally in violation of the Fourth Amendment (search and seizure), the Fifth Amendment (privilege against self-incrimination), or the Sixth Amendment (right to assistance of counsel, right of confrontation etc.), of [the] U.S. Constitution."

*State v. French*, 72 Ohio St.3d 446, 449 (1995), quoting *Black's Law Dictionary* 1014 (6th Ed.1990). The exclusion of such evidence is "designed to deter police misconduct * * * ." *U.S. v. Leon*, 468 U.S. 897, 916 (1984).

{¶12} However, "[a]n accused 'cannot invoke the [F]ourth [A]mendment to suppress evidence of his own unlawful conduct which was in response to police actions in violation of the amendment.'" *State v. Johnson*, 173 Ohio App.3d 669, 2007-Ohio-6146, ¶ 22 (9th Dist.) (Carr, J., concurring), quoting *Dayton v. Joy*, 2d Dist. Montgomery Nos. CA11846 & CA11847, 1990 WL 98379, *2 (July 2, 1990). "In cases where the response has been a physical attack upon the officer making the illegal arrest or search, courts have held that the evidence of this new crime is admissible." *State v. Barnes*, 2d Dist. Montgomery No. 16434, 1997 WL 752590, *3 (Dec. 5, 1997). To apply the exclusionary rule in those cases "would in effect give the victims of illegal searches a license to assault and murder the officers involved – a result manifestly unacceptable." *Barnes* at *4, quoting LaFave, *Search and Seizure*, Section 11.4(j) (3d Ed.1996).

{¶13} Assuming without deciding that the officers violated Dickson's Fourth Amendment rights by entering his home, this violation would not serve to exclude evidence of his unlawful conduct against an officer. Officer Rouse testified that when he entered the home, Dickson was "irate." According to the testimony of Officers Rouse and Todd Stump, Dickson continued to shout and cuss at them while they attempted to calm him down and to deescalate the situation. Officer Rouse testified that Dickson then pushed him. It was at that point that Officer Rouse "decided that [he was] not going to get pushed anymore, * * * [and] to arrest [Dickson] for disorderly conduct * * *."

{¶14} A motion to suppress cannot be used to exclude a subsequent assault on an officer, even if that officer has violated the defendant's Fourth Amendment rights. Therefore, Dickson could not have used a motion to suppress to exclude evidence of his conduct which formed the basis of his disorderly conduct and resisting arrest convictions. Because a motion to suppress would not have excluded testimony of his conduct, Dickson cannot show that he was prejudiced by his trial counsel's failure to file a motion to suppress. Without a showing of prejudice, Dickson's claim of ineffective assistance of counsel must fail. Accordingly, Dickson's first assignment of error is overruled.

### Assignment of Error Number Two

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECORED (sic) SUFFICIENT EVIDENCE TO SUPPORT THE CHARGES LEVIED AGAINST DICKSON IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶15} In his second assignment of error, Dickson argues that the State failed to produce sufficient evidence to support his convictions.

{¶16} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶17} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386. This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

**Coercion**

{¶18} A.C.C. 135.08(B)(1) provides that: "No person, with purpose to coerce another into taking or refraining from action concerning which he has a legal freedom of choice, shall * * * [t]hreaten to commit any offense."

{¶19} There is no dispute that several phone conversations were had between Dickson and the Alexanders, and between Dickson and the police. All of these conversations took place on Cabell's cell phone. While the testimony does conflict as to what was said during those conversations, we review the evidence in a light most favorable to the State when reviewing for sufficiency of the evidence. *Jenks*, 61 Ohio St.3d at paragraph two of the syllabus.

{¶20} Donald Alexander testified that he received a phone call from Cabell in response to the lost dog poster that his wife, Shannon Alexander, had put up at a local convenient store. Donald testified that Cabell asked him how much the reward was and he replied, "[a] hundred

bucks." The two then arranged to meet at the corner of Archwood and Grant Street to make the exchange. Cabell arrived, without Papa Bear, and showed Donald photographs of the dog on his phone. Donald identified the dog as his and explained that Shannon had the $100 reward and that he would give it to him when she finished work later that evening. Cabell then said he had to call his uncle. Cabell made a phone call and handed the phone to Donald. Donald explained to the person on the phone, later identified as Dickson, that he would give him the $100 as soon as his wife finished work, but was told: "[t]his is how this is going to work. You're going to give me $500 or you're not going to see the dog." Donald hung up, called Shannon, and later, called the police.

{¶21} Shannon Alexander testified that she received a call about her missing dog shortly after posting the flyer offering a reward. She asked Cabell to contact her husband, Donald, because she was on her way to work. She received another phone call from Cabell later that evening "saying he didn't want to speak to [Donald] any longer" and "[h]e didn't want to talk to any policemen." Shannon testified that "Dickson actually spoke up and he said, 'We want $500. I spent more than a hundred dollars on this dog already. I'm not going to take a hundred dollars from you or your husband. I want my $500 for the dog." Shannon said she began crying and tried to explain that she did not have $500. Dickson hung up on her. When she called back, Shannon testified that Dickson said: "I want $500. I want it tonight. If not, he's my dog. I will do what I want with him. I will shoot him in his head if I want to. Matter of fact, I didn't want him to begin with." Shannon told Dickson she would make some calls to see if she could come up with the money. Meanwhile, Shannon said she was sent home from work because she was "crying and * * * extremely upset."

**{¶22}** Officer Michael Stanar testified that he was dispatched to the Alexander residence to take a report of a stolen dog. Officer Stanar spoke with Donald and learned of the attempted exchange at Archwood and Grant Street and the demand for $500. Officer Stanar testified that he called Cabell's phone and attempted to negotiate the return of the dog. According to Officer Stanar, he identified himself as an Akron Police Officer, but that the male voices on the other end did not believe him. Ultimately, Officer Stanar was told that they wanted $500 for the dog, and they hung up on him.

**{¶23}** Officer David Rouse testified that he was working alongside Officer Stanar the day the Alexanders reported the dog stolen. Officer Rouse was present when Officer Stanar made the call to Cabell in an attempt to negotiate the return of the dog. Officer Rouse testified that after Cabell and Dickson hung up on Officer Stanar, Officer Rouse called back. According to Officer Rouse, Dickson was yelling and cussing at him. Dickson then said he did not care if Officer Rouse was the police, and that "he was going to kill the dog."

**{¶24}** Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that Dickson threatened harm to the dog in an attempt to get the Alexanders to pay him $500. We conclude there is sufficient evidence to support Dickson's conviction for coercion.

**Disorderly Conduct**

**{¶25}** A.C.C. 132.01(A), which is identical to R.C. 2917.11(A), provides, in relevant part, that:

> No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
>
> 1. Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;

2. Making unreasonable noise or offensively coarse utterance, gesture, or display, or communicating unwarranted and grossly abusive language to any person * * *.

{¶26} Dickson argues that "no officer testified that they were alarmed or annoyed by Dickson's conduct" and that police officers cannot be inconvenienced while performing their professional duties, citing *State v. Miller*, 67 Ohio App.2d 127 (3d Dist.1980).

{¶27} In *Akron v. Anderson*, 9th Dist. Summit No. 15090, 1991 WL 207866 (Oct. 9, 1991), we noted that even the Third District distinguished *Miller* from cases where the disorderly "conduct and language [is] *directed toward the officer*." (Emphasis sic.) *Anderson* at *2, citing *State v. Freewalt*, 3d Dist. Auglaize No. 2-87-11, 1988 WL 72400, *3 (June 30, 1988). "[W]e expressly reject the notion advanced by the defendant that simply because a police officer must routinely expect to encounter the language or conduct proscribed in R.C. 2917.11 in the course of performing his job, such conduct or language is not actionable as to him under that statute." *Anderson* at *2.

{¶28} Officer Rouse testified that, upon arriving at Dickson's house, he approached the sliding glass door in the back and asked for "Uncle Dave." According to Officer Rouse, Dickson stepped out of the house and tried to push him off of the porch while yelling "Nobody's coming into my house until I get my money." Officer Rouse further testified that he attempted to talk to Dickson to try to figure out what was going on, but that Dickson pushed him again and went back inside the house. After Officer Rouse gained entry into the house, Dickson ran toward him with the reward flyer, cussing and screaming that he just wanted his money. Officer Rouse described Dickson as "irate" and said that he repeatedly attempted to calm him down. At this time, Officer Rouse said, he was "still trying to figure out what's going on, who he is, what his involvement is, [and] where the dog is, which [ ] could [be] hear[d] upstairs barking." Officer

Rouse testified that he "must have said relax like ten times" to Dickson. Officer Rouse also testified that he and Officer Stump were trying to get Dickson's identification information, but Dickson was being uncooperative and would not calm down. Dickson again pushed Officer Rouse, and the officers arrested him.

{¶29} Officer Stump testified that he had concerns about Dickson's demeanor and repeatedly told him to relax and calm down. Officer Stump testified that he explained to Dickson that they "needed him to cooperate" and that Dickson then became "more aggressive towards [the officers]." Officer Stump said that he explained to Dickson that he would be arrested if he did not stop the "disorderly conduct." However, Dickson "continued to not comply with any of [the officers'] orders."

{¶30} Officer Stanar testified that when he entered the house Officers Rouse and Stump were trying to calm Dickson down. Dickson "kept cussing various cuss words" and "kept saying that he wanted his money." Officer Stanar further testified that Officers Rouse and Stump were trying to get Dickson's information but he refused to cooperate.

{¶31} Viewing the evidence in a light most favorable to the State, Dickson repeatedly pushed Officer Rouse and used "grossly abusive language" towards the officers. A.C.C. 132.01(A)(2). We conclude that the evidence is sufficient to support, beyond a reasonable doubt, Dickson's conviction for disorderly conduct.

**Obstructing Official Business**

{¶32} A.C.C. 136.11(A), which is identical to R.C. 2921.31(A), provides that:

No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties.

{¶33} Dickson argues that his conviction is based on insufficient evidence because the officers were not performing a lawful duty when they arrested him for obstruction. Specifically, he argues that the police had violated his Fourth Amendment right against unreasonable search and seizure when they entered his house without a warrant and with no exigent circumstances.

{¶34} Assuming arguendo that the warrantless entrance into Dickson's home was a violation of his constitutional right against unreasonable search and seizure, such a violation did not prevent the police from arresting Dickson because the police observed a fresh crime being committed. *Akron v. Holmes*, 9th Dist. Summit No. 21590, 2004-Ohio-832, ¶ 13, quoting *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, ¶ 13 (7th Dist.). "It is clear that further criminal acts, such as obstructing official business and resisting arrest, are not legitimatized by Fourth Amendment transgressions." *Holmes* at ¶ 14.

{¶35} Here, Officers Rouse, Stump, and Stanar struggled to arrest Dickson for disorderly conduct. The officers had repeatedly tried to calm Dickson down to determine his identity, his involvement with the missing dog, and whether the dog they could hear barking upstairs was the dog reported to be stolen. The officers repeatedly instructed Dickson to put his arms behind his back, but Dickson kept cussing at them. Officer Rouse had grabbed one of Dickson's arms, Officer Stump had grabbed the other, but Dickson kept pulling his arms away. Ultimately, Officer Stanar testified that he pulled out his taser and "put it on his upper chest just under his neck, * * * and [ ] said, 'Put your hands behind your back. Stop resisting * * * or you are going to get tased.'" Officer Stanar further testified that Dickson kept "egging [him] on," saying, "Come on tase me."

{¶36} After viewing the evidence in a light most favorable to the State, we conclude that Dickson's resistance is sufficient to support his conviction of obstructing official business.

**{¶37}** Accordingly, Dickson's second assignment of error is overruled.

Assignment of Error Number Three

DICKSON'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE [ ] IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OT THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**{¶38}** In his third assignment of error, Dickson argues that his convictions are against the manifest weight of the evidence.

**{¶39}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387. An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**Coercion**

{¶40} A.C.C. 135.08(B)(1) provides that: "No person, with purpose to coerce another into taking or refraining from action concerning which he has a legal freedom of choice, shall * * * [t]hreaten to commit any offense."

{¶41} Dickson argues that his conviction is against the manifest weight of the evidence because he never threatened to hurt the dog. Shaquille Amos, a friend of Dickson and Cabell, testified that he was at Dickson's house during the various phone conversations to negotiate the return of the dog. Amos stated that he never heard Dickson threaten to kill Papa Bear. Jeremy Gaddis, a life-long friend of Dickson, also testified that he was at Dickson's house during some of the phone conversations. According to Gaddis, Dickson never said he could have killed the dog, but did say that he "could have beat it with a pole." Cabell also testified that no threats were made to harm the dog. Cabell stated that in response to a question about whether they were going to kill Papa Bear, Dickson replied, "I could have beat the dog with sticks when it first got here, but I didn't do that, now did I?" Lastly, Dickson himself testified that he never threatened to kill the dog.

{¶42} Donald Alexander testified that Dickson demanded $500 "or you're not going to see the dog." Shannon Alexander testified that Dickson demanded $500 or "he's my dog. I will do what I want with him. I will shoot him in his head if I want to." Officer Stanar also testified that Dickson demanded $500 for the return of the dog. Officer David Rouse testified that Dickson said he wanted his money, did not care if Officer Rouse was the police, and that "he was going to kill the dog."

{¶43} While the witnesses presented various versions of what exactly was said, the jury was entitled to believe all, part, or none of the testimony of each witness. *State v. Roper*, 9th

Dist. Medina No. 12CA0001-M, 2012-Ohio-3526, ¶ 17. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *Id.*, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

**{¶44}** After reviewing the record and giving the trier of fact its due deference as to the issues of credibility, we cannot conclude that this is an extraordinary case where the jury clearly lost its way. *See Otten* at 340.

**Disorderly Conduct & Obstructing Official Business**

**{¶45}** Dickson does not set forth arguments about why his convictions for disorderly conduct and obstructing official business are against the manifest weight of the evidence. Instead, he limits his challenge to the sufficiency of the evidence of those convictions. This Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). *See also* App.R. 16(A)(7).

**{¶46}** Dickson's third assignment of error is overruled.

III

**{¶47}** Dickson's assignments of error are overruled. The judgment of the Akron Municipal Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
CONCURS IN JUDGMENT ONLY.

BELFANCE, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

DAWN M. KING, Attorney at Law, for Appellant.

GERTRUDE WILMS, Chief Prosecuting Attorney, and THOMAS D. BOWN, Assistant Prosecuting Attorney, for Appellee.